IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARY MATEJEVICH, )
        Plaintiff )
)
vs. ) Civil Action No. 06-1557
) Judge Terrence F. McVerry/
MICHAEL J. ASTRUE, Commissioner ) Magistrate Judge Amy Reynolds Hay
of Social Security, )
        Defendant )

# REPORT AND RECOMMENDATION

## I. RECOMMENDATION

Acting pursuant to 42 U.S.C. § 1383(c), which incorporates § 405(g), Mary Matejevich ("Matejevich" or "the claimant") seeks review of the final decision of the Commissioner of Social Security ("the Commissioner") disallowing her claim for supplemental security income and disability insurance benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f. Cross Motions for Summary Judgement, are pending. It is respectfully recommended that Motion filed by Matejevich Doc. 12) be granted insofar as it seeks remand, and that the Motion filed by the Commissioner (Doc. 15) be denied.

## II. REPORT

### A. ALLEGATIONS OF ERROR

Although the court has carefully reviewed the entire record, it will limit discussion to the narrow issues raised by the claimant:

1. Did the ALJ err in finding that Matejevich's migraine headaches did not affect her activities of daily living when there were multiple medical records documenting that she is frequently incapacitated?

2. Did the ALJ rely on a faulty hypothetical where the question posed to the vocational expert did not include the claimant's inability to attend work on a regular and consistent basis due to frequent migraine headaches?

1

## B. PROCEDURAL BACKGROUND

This is Matejevich's third application for benefits. The first was filed in April 1998 and denied approximately one month later. The second was filed in July 1999 and denied in November 1999. Matejevich did not request a hearing in connection with either of these applications. In the application now under consideration, filed on May 26, 2002, Matejevich alleges that she became disabled on January 30, 1996, as a result of depression, sleep deprivation, and migraine headaches. (T. 63, 72, 537). This claim was initially denied on December 3, 2004, and Matejevich requested an administrative hearing. The hearing took place on December 13, 2005, before an Administrative Law Judge ("ALJ") in Latrobe, Pennsylvania. The claimant, who was represented by counsel, and a vocational expert testified. In a decision dated April 17, 2006, the ALJ determined that the claimant was not disabled because she retained the mental and physical capacity to perform work available in significant numbers in the national and local economies. On September 20, 2006, the Appeals Council denied Matejevich's request for review, making the decision of the ALJ the final decision of the Commissioner. This timely appeal followed.

## C. THE MEDICAL EVIDENCE PERTAINING TO MIGRAINES

In a Psychiatric Evaluation Form completed at UPMC's Western Psychiatric Institute and Clinic on September 25, 1996, the claimant stated that she had suffered from recurring headaches over a two year period when she was a teenager. Although she had been hospitalized and had undergone a CT scan, the etiology of the pain was indeterminate. (T. 108).

On a medical history form completed on October 14, 1998, the claimant wrote that she had suffered from "some _very severe_ headaches over the last month and a half" during which she was incapacitated. (T. 139). While she was in the hospital, she received a neurology

consultation. The neurologist's impression was that Matejevich suffered from "mixed headache syndrome" including migraine, musculoskeletal headaches, and neuralgia. She was given Naprosyn and Imitrex for severe headaches. Physical therapy, heat, ultrasound, and massage were recommended. The claimant was also told to use Inderal or Calan in the event that the other medications did not help. (T. 145). The doctor recommended an MRI and an EEG. (T. 294).

On November 2, 1998, Matejevich told her doctor that she experienced headaches that hurt "all over," nd had been in pain for the past week. This headache immobilized her, and made her sensitive to light. (T. 294). An MRI conducted later the same month showed a light focal area described in patients having migraine headaches. Non-specific features of the EEG were correlates of vascular headaches. Neither of these tests was, however, characterized as abnormal. (T. 235, 237).

The claimant's headache complaints were in remission until February 1999 when she was again admitted to UPMC's Western Psychiatric Institute. Her discharge summary noted that she had experienced periods of headache remission in the past, but that they recurred within months. During her hospitalization, she complained of headaches that were controlled with Tylenol. (T. 240). On February 19, 1999, Matejevich complained of persistent nausea and headaches, stating that she believed them to be depression related. (T. 464).

On March 4, 9, 16 and 18, Matejevich complained of "terrible headaches" which she characterized as "dull, throbbing, and global." (T. 255,459, 458, 460). She was told to revisit neurologist Dr. Kaniecki. (T. 256).

On April 2, 1999, the claimant reported to her therapist that she had been "laid low" by a terrible headache the day before, and continued to feel "hung over". She stated that her headaches were less frequent, and that one of her doctors had associated the headaches with depression. (T. 257). On April 12, 1999, she reported continued headaches. (T. 456). On April

27, 1999, Matejevich told her doctor that she had suffered one or two migraine headaches since her last appointment, but that they were improving overall. (T. 455).

On May 6, 1999, the claimant cancelled an appointment with her therapist due to a migraine. (T. 259). Approximately two weeks later, Matejevich told her physician that she was having headaches, but the pain was reduced by Excedrin. (T. 454). In June and July 1999, her headaches were less frequent and less severe. (T. 450, 452).

Matejevich's headache pain spiked in late August 1999. She complained of "bad" headaches that did not respond to Imitrex. The pain occurred around the time of her menses, was sharp, all over her head, and was associated with photophobia. (T. 296). In early September 1999, she complained that her migraines had increased, especially premenstrually. (T. 449). On October 28, 1999, Matejevich stated that she had suffered a severe migraine the week before that lasted one day. Her medicine did not help. (T. 448).

In January 2000, the claimant discussed her headache medications, stating that she still experienced migraines during her period. (T. 295). After more than a year with no headache complaints, Matejevich reported in March 2001 that her migraines had recurred; she was unable to identify a trigger. (T. 443). She reported in August 2001 that she suffered from occasional headaches. (T. 440).

She complained of headaches around the time of her period again in April 2002. In October 2002, following hospitalization for a fainting episode during which she fell and struck her head, Matejevich complained of a headache. (T. 435). One month later, she reported suffering from an increase in severe headaches. Id She complained of sinus headaches in March 2003, severe incapacitating migraines in May 2003, and chronic headaches in June 2003. (T. 430, 432, 433). In August 2003, she told her doctor that she was considering relocating to a dry climate in order to reduce her headaches. (T. 428).

Beginning again in May 2004, Matejevich stated that she was "demoralized" by

"crippling headaches". (T. 425). The migraine headaches were lasting for two days with a "hangover" effect. She reported that she was due to see a headache specialist soon. (T. 426). Matejevich continued to complain of migraine headaches into June 2004. She asked to taper her dosage of Effexor to see if it would help, and stated that she planned to try acupuncture. (T. 424). In July 2004, the claimant continued to experience many headaches with severe pain behind her left eye. She felt worse than she had in four years, although decreasing the dosage of Effexor seemed to have helped with the frequency of the headaches. (T. 423).

While the migraines were fewer in number by August 2004, in September, the claimant visited a headache specialist . The notes of that visit reflect that the claimant experienced headache pain from four to fifteen times per month, lasting one to three days. Her current headaches were "bilateral and retro-orbital with posterior radiation. She describes a 'knife' of pain that worsens with activity and reaches a severity of 9/10. She may have nausea, vomiting, photophonophobia and occasional left sided paresthesias." (T. 313). She also experienced a "dull ache rating 4/10 in severity, associated with the tapering of Effexor." Id. Her medication was adjusted, and she was told to return in two to four months. (T. 312).

Matejevich's problems with severe and debilitating migraines were documented repeatedly throughout the remainder of 2004. (T. 373, 371, 421, 368, 420, 366, 420, 365, 364, 419, 383, 369). In early January 2005, the claimant was "dealing with headaches and muscle aches in her neck and back" which restricted her movement and affected her gait. (T. 360). On January 7, her medication was changed and the frequency of the headaches decreased. (T. 418). She did not suffer any significant migraines for a few weeks. This remission ended in early February 2005. Even then Matejevich reported that although she still had migraines, they were less frequent and intense - not "knocking her out all day." (T. 417).

On March 9, 2005, the claimant's medical records reflect that she had suffered a severe migraine followed by a day or two "hangover". She was diagnosed with "severe migraines." (T.

355). Two weeks later, Matejevich reported that she had suffered migraines on six days. The headaches "consist[ed] of pain, nausea, dizziness, sickness, inability to eat, hangover, fatigue, and depression. She [was] very discouraged about how disabling the migraines [were]. The migraines disrupt many important and ordinary activities." (T. 354). On April 6, 2005, Matejevich had been headache free for one week (T. 353). Two weeks later, however, she experienced a three day disabling migraine which made her physically sick. She was fatigued and had little motivation, could not concentrate, and found it hard to get out of bed. (T. 352). On April 22, 2005, she reported feeling "at wit's end" about the migraines because she could not discern any pattern in their occurrence. (T. 415).

On May 4, 2005, Matejevich stated that she had experienced eleven days of disabling migraines during the month of April. She had scheduled a follow-up visit with her headache specialist, and planned to try a new medication, Axert. (R.351). In June 2005, she continued to suffer from migraine headaches. (T. 415). At the end of the month, she met with the headache specialist, telling him that her symptoms had worsened since her last visit. The doctor wrote that the claimant had experienced an average of eight headaches per month, six of which were incapacitating. He diagnosed perimenopausal migraines and again changed her medication. (T. 382).

In July 2005, Matejevich reported many days of migraines over the prior ninety days. She was tearful because the headaches were so disabling, especially before and during her periods. (T. 413-14). She continued to report migraines through her doctor's visit on August 12, 2005. The problem appears to have been in remission until late October. At that point, her doctor, in completing a mental impairment questionnaire, reported that she had developed severe incapacitating migraines that seemed to improve when her anti-depressant medication, Effexor, was discontinued. She had not been able to function for more than three months without recurrence of the headaches. (T. 399- 409). The claimant continued to complain of migraines

6

into early December 2005. ( T. 514, 516).

### D. MATEJEVICH'S TESTIMONY

At the time of the hearing, the claimant was a forty-six year old single woman with a high school diploma and one year of college education. (T. 565-66). She had worked in the past as an editorial assistant, and as a news assistant. She left this line of work because she was no longer interested in writing about business, and the stress level was extremely high. She then worked for a temporary agency where she was assigned to a job as an administrative assistant in a hospital and then to a similar position in a manufacturing firm. (T. 571). Due to her illness, she was unable to perform remunerative work of any kind after January 1996.

At the hearing, Matejevich identified her primary medical problems as major depression, "some problems with anxiety," and post-traumatic stress syndrome. (T. 575). She also described having had headaches, " but not the kinds of migraines I have had in the recent past." Id. The claimant stated that since she began seeing Dr. Kaniecki, a neurologist specializing in the treatment of headaches, her symptoms had improved and, as a result of the "new" medication, she "had far fewer migraines than [she] had this spring." (T. 578). She elaborated that she had experienced an "amazing reduction." Id. No one asked her how often she continued to suffer from debilitating headaches.

When asked to describe her daily activities, the claimant responded that she liked to read when she could, but that her mind often felt "dulled." (T. 581). She was able to watch television for about two hours per day, and enjoyed PBS channels. Id. She had a checking account, could pay her own bills, and attended church with the mother once every couple of months. (T.582). She was able to eat at a restaurant about once per month and enjoyed taking walks. (T.584). She could dress herself and prepare simple meals. Id. She had not driven for ten years. Depending on the depth of her depression, she could dust furniture, vacuum, wash dishes, and fill a

7

dishwasher. (T. 586). She could do her own laundry and grocery shop with her mother. Her depression began when she was in her teens. For the past five years, she had visited a psychiatrist about once per month and attended additional counseling sessions with the same frequency.

The post-traumatic stress aspect of her problems stemmed from a date rape in the late eighties. This condition caused nightmares and interrupted sleep. (T. 589). Matejevich claimed that she was excessively tired, sometimes sleeping as little as four hours per night, and needing to nap one to five hours on six out of every seven days. She stated that she had taken medication for her mental impairments, including Effexor and Cymbalta. When her Effexor dosage was decreased, her "migraines reduced dramatically." (T. 593).

She stated that she occasionally suffered tremors and spent very little time outside of her home. She visited friends once or twice per month, and was visited by friends approximately once per month. (T. 594).

### E. THE ALJ'S OPINION

The ALJ arrived at the finding that Matejevich was not disabled within the meaning of the Social Security Act ("the Act") by applying the sequential five step analysis articulated at 20 C.F.R. §404.1520(a) and 416.1920(a).[1] He resolved this matter at Step Five.

After finding that the claimant had not engaged in gainful employment during any applicable time period, the ALJ proceeded to Step Two, where he concluded that Matejevich had

---

[1] The familiar five steps are as follows: (1) If the claimant is performing substantial gainful work, she is not disabled; (2) If the claimant is not performing substantial gainful work, her impairment(s) must be "severe" before she can be found to be disabled; (3) If the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry; (4) If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled; (5) Even if the claimant's impairment or impairments prevent her from performing her past work, if other work that accommodates her residual functional capacity and vocational factors exists in significant numbers in the national and local economies, she is not disabled.

8

a number of severe, medically determinable impairments, including migraine headaches, syncope, major depressive disorder, anxiety, and post traumatic stress disorder. (T. 15). None of these impairments, alone or in combination, was found to constitute a listed impairment at Step Three (T. 15). Commenting on the record pertaining to Matejevich's migraine headaches, the ALJ wrote that they did "not interfere significantly with [the claimant's] daily activities." Id. At Step Four, the ALJ determined that Matejevich could not return to her past relevant work. Thus, he moved to Step Five where he determined that the claimant had the residual functional capacity to engage in a range of work subject to a number of restrictions including climbing ladders, ropes or scaffolds, exposure to moving machinery and unprotected heights. She could not perform work involving more than simple, routine, repetitive tasks and simple work-related decisions or work done in a production or quota based environment. She was limited to positions requiring only occasional interaction with supervisors, and little interaction with coworkers or the public. Id.

Based on hypothetical questions posed by the ALJ, the vocational expert testified that there were jobs available in both the national and local economies which could be performed by a person having the residual functional capacity attributed to Matejevich.

### E. STANDARD OF REVIEW

The Act limits judicial review of the Commissioner's final decision regarding benefits to whether the factual findings are supported by substantial evidence, Brown v. Brown, 845 F.2d 1211, 1213 (3d Cir. 1988), and whether the correct law was applied. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984).

### G. ANALYSIS

In Rutherford v. Barnhart, 399 F.3d 546, 554 n.8 (3d Cir.2005), the Court of Appeals for the Third Circuit observed that challenges to an ALJ's findings at Step Five of the

disability determination are made in one of two ways. First, the claimant may allege that the ALJ failed to include all of her limitations in the hypothetical question posed to the vocational expert. Alternatively, the claimant may make a closely related argument that the ALJ failed to recognize credibly-established limitations during the residual functional capacity assessment, and, as a result, failed to convey those limitations to the vocational expert. Matejevich makes both of these arguments. She challenges the ALJ's assessment of the impact of recurring, debilitating migraine headaches on her residual functional capacity, and contends that because the ALJ improperly discounted the severity and frequency of her headaches, the hypothetical questions posed to the vocational expert were faulty. The court finds that these allegations have merit.

The ALJ discussed the medical evidence pertaining to the complainant's headaches in a few sentences. His focus instead was on Matejevich's subjective complaints, which he discounted on credibility grounds: "The undersigned finds the claimant's testimony concerning her impairments and their impact on her ability to work not totally credible in light of her description of her daily activities and lifestyle, the objective medical evidence of record and treating medical opinions regarding the severity of the claimant's condition and functional limitations." (T. 17).

The law with respect to the weight to be accorded subjective symptoms in a case of this type is well established. In Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985), the Court of Appeals for the Third Circuit reiterated the standard to be applied in evaluating subjective complaints: (1) subjective complaints should be seriously considered, even where not fully confirmed by objective medical evidence, see Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); (2) subjective complaints "may support a claim for disability benefits," Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971), and "may be disabling," Smith, 637 F.2d at 972; (3) when subjective complaints are supported by medical evidence, they should be given great weight, Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981); and (4) where a claimant's

testimony is reasonably supported by medical evidence, the ALJ may not discount that testimony without contrary medical evidence. Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984). Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. See Plummer v. Apfel,186 F.3d 422, 429 (3d Cir. 1999). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

The Commissioner argues that the ALJ's credibility determination is entitled to great deference because it is supported by substantial evidence. See Reefer v. Barnhart, 326 F. 3d 376, 380 (3d Cir. 2003). He contends that the following aspects of the record cast doubt on Matejevich's description of her symptoms: (1) her headaches improved with medication within the meaning of 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416 .929(c)(3)(iv) (providing that subjective complaints are not fully credible where medication alleviated the claimant's symptoms);( 2) there are gaps in time where the claimant did not report migraines, see Ortiz v. Secretary of Health and Human Services, 995 F.2d 765, 769 (1st Cir. 1991) (explaining that gaps in the medical record are considered evidence); and (3) the claimant herself made significant inconsistent statements with respect to this impairment, see Tonepetyan v. Halter, 242 F.3d 1144, 1148 (reducing credibility where claimant makes inconsistent statements).

The claimant counters that the evaluation of her credibility was flawed because it failed to take into account the record's thorough documentation of the fact that she regularly suffered from and received extensive treatment for migraine headaches that compromised her ability to attend and function at work on a sustained basis. She contends that the credibility analysis was further compromised because it was based on mischaracterization of the record and failed to account for the full scope of her headache-related difficulties both in the formulation of her residual functional capacity and the questions posed to the vocational expert.

The court is troubled by the ALJ's treatment of the headache related evidence. While normally the ALJ's credibility determination is entitled to deference, Reefer, 326 F.3d at 380, in this case there are enough anomalies in the ALJ's credibility conclusions to convince the court that remand is warranted.

The court revisits briefly the body of evidence documenting Matejevich's headache claims. As the court has noted, this evidence shows that the frequency and intensity of these headaches were not constant. The headaches tended to be severe, decrease or go into remission, then recur. They also seem to have been cyclical, varying with the claimant's hormone levels so that they occurred most often around the time of her menses. It is clear that Matejevich complained about these headaches and described their negative impact on her ability to function over a period of years. It is equally clear that those treating her took her complaints seriously, never suggesting that she had exaggerated her symptoms or that she was malingering. She was referred for testing and to a neurologist. She was also given multiple medications for depression and headache; these were adjusted several times. Some of these drugs seemed effective, at least for a time, and Matejevich did not hesitate to apprise her doctors of improvement. Always, however, the headaches recurred. In an effort to cope with the pain, Matejevich considered relocation to a dry climate, acupuncture, and treatment by a wholistic practitioner. As late as May 25, 2005, the claimant was given a prescription of a new headache drug, Axert, and at the time of the hearing, she testified that she gave herself injections of Imitrex.

The ALJ briefly addressed this body of evidence and the claimant's testimony. First, he noted that although Matejevich had ben treated frequently for headaches, objective tests, which were consistent with the types of headache Matejevich described, "might be clinically insignificant." (T. 15). He then stated that Matejevich was on medication to help control her headaches. He did not, however, refer to her frequent complaints that the medicine was ineffective, or to the fact that the dosage and combination of drugs were modified on a regular

basis in an effort to increase their effectiveness and diminish their side effects.

Apparently still addressing credibility, the ALJ found it significant that the frequency of the claimant's headaches varied. He then chose excerpts of her treatment chronology suggesting that the frequency and intensity of the headaches had undergone a linear decrease: "In October 1998, she reported that they were occurring almost daily, however the frequency has varied. In September 2004, she informed a headache specialist that they were then occurring four to fifteen times a month and lasted from two to three days. In October 2004 she alleged two headaches a week. More recently, they decreased in frequency." (T. 16). The ALJ also wrote that Matejevich's headaches stopped altogether when she stopped taking the anti-depressant Effexor. (T. 18).

The record does show that for variable periods of time, Matejevich did not complain of headaches. It does not, however, show that the claimant's headaches followed the patten identified by the ALJ. For example, in March 2005, she suffered migraines on six of fourteen days. In April 2005, she suffered eleven days of debilitating migraines. In June 2005, her headache specialist reported that she suffered an average of eight headaches per month, six of which were incapacitating. Furthermore, despite the ALJ's assertion that the claimant testified at her hearing that the headaches stopped when she went off of Effexor, (Tr. 18), the court has combed the hearing transcript and has not located this testimony. It is clear that Matejevich did not try to minimize the degree of improvement in her symptoms. She testified forthrightly that after her Effexor was discontinued, the number of headaches decreased far below the number she experienced in the spring. She was not, however, asked to and did not quantify the reduction, nor did she say that the headaches were gone. In fact, she testified that she continued to inject herself with Imitrex when she experienced migraine headaches. (T. 578).

The ALJ also based his credibility finding in part on Matejevich's activities of daily living: "She states that her frequent headaches interfere with her ability to perform many

13

activities. She testified that six days out of seven she must lie down and take a one to five hour nap." (T. 16). The ALJ did not find this testimony credible because "the claimant's hygiene and grooming are appropriate. She does not require any assistance taking care of personal needs. Despite her impairments she is able to cook, sweep, dust, wash dishes, wash laundry and shop." Id. Matejevich testified that she did not undertake these activities often and, in any event, the court is not convinced that the ability to perform minimal housekeeping chores is inconsistent with the need to nap.

Again discussing credibility, the ALJ commented on the claimant's other periods of activity:

> In July 2004, she stated that she was somewhat worse with more headaches. However, in December 2004 and January 2005, she was still socially active, dating and involved with her writers group. On January 26, 2005, she reported that she felt the best she had in months and her headaches had decreased in frequency. In February 2005, she started a dance class and, again reported that her headaches were less frequent.

(T.18). The court is nonplused by this statement's relevance given that it is entirely consistent with the medical record and Matejevich's testimony. When the claimant's headaches improved, she wanted to, was able to, and did do more. The record does not reflect that she was at all reluctant to admit this. Though the ALJ noted that in February Matejevich was more active, the next month she had eight migraine headaches in fourteen days, and in April, she suffered eleven migraine headaches. The claimant was not able to continue the activities that she had enjoyed earlier in the year. The claimant's point is that for some period of nearly every month, even those in which she was experiencing *relatively* few headaches and doing more things, she would have had to miss at least some work because of a headache or the necessary recovery period.

The ALJ next found that the claimant's credibility was undermined by the fact that in October 1998, she told her doctor that she did not have a history of motion or "ice cream"

14

headaches. In September 2004, however, she told her physician that she had experienced both. Id. The Court recognizes this inconsistency, but is not persuaded that the single discrepancy is sufficient ground for rejecting Matejevich's subjective complaints. This is especially true where the ALJ tied the claimant's inconsistent statement to a comment made by one of Matejevich's doctors during her psychiatric hospitalization in November 2005. The doctor wrote: "It is obvious that the patient is basically well trained in psychotherapy as a patient . . ." In his opinion, the ALJ used this portion of the doctor's sentence to argue that although the doctor's comment lacked clarification, it supported the conclusion that "the claimant has not always been consistent in reporting her symptoms and has adopted complaints that she previously denied." (T. 18).

The court is convinced that the doctor's statement was pulled out of context in order to suggest that Matejevich manipulated her medical history to make it seem that she was sicker than she was. Even a cursory glance at the full text of the doctor's comment establishes that this is *not* what he intended to communicate. His notes were written in the context of Matejevich's admission to an inpatient psychiatric facility. He recorded her history of being depressed, her treatment by a number of doctors, her multiple hospitalizations and the experimentation with medication. The only thing that had not been tried was electro-convulsive therapy, which the claimant refused. After summarizing these historical facts, the doctor wrote: "It is quite obvious that the patient is basically well trained in psychotherapy as a patient, and it is practically impossible to consider or to think that anything new or different can be offered during this hospitalization other than the process of stabilization." (T. 516).

The court cannot fathom how this sentence can reasonably be read to support the ALJ's argument that Matejevich used knowledge gained through therapy to misrepresent her own symptoms. In light of the record as a whole, it seems just as likely that Matejevich's inconsistency was inadvertent, or that between her first questioning in 1998 and the interview in 2004, she *had* experienced these additional symptoms. Not one of the doctors who treated her

15

indicated a belief that Matejevich was dissembling or exaggerating her symptoms. Instead, they accepted her account of her headaches, and made that account the basis for treatment.[2]

Finally, the court addresses the Commissioner's argument, made in his brief, that the claimant's credibility was diminished by her testimony that she suffered fewer migraines after her doctor discontinued the drug Effexor. According to the Commissioner, "review of the treatment notes for the corresponding period demonstrate[s] that she reported up to ten headaches per month." (Doc. 16 at 17). This statement is patently inaccurate. At the hearing, Matejevich testified that her migraines had improved dramatically since she stopped taking Effexor. (T. 578.) The very documents cited by the Commissioner show that the Effexor was discontinued on September 4, 2005, (T. 411), and that the "eleven headaches per month" were reported some months prior, in April 2005. (T. 351).

By contrast, on September 16, 2005, her migraines were "quiet". (T. 411). The same was true in October 2005. (T. 410). In November 2005, the treatment notes say little more than that the claimant took Imitrex for migraine headaches.(T.514, 516). These latter notes do not mention the frequency of her continuing headaches, but are consistent with Matejevich's testimony that her headaches were greatly diminished, but did not end during the period post-Effexor. Id. The remaining treatment notes were written prior to discontinuation of the Effexor, and, as a result, have no bearing on the credibility issue raised by the Commissioner. (T. 414, 412, 413).

One additional aspect of the ALJ's opinion merits mention. The Commissioner argues that the ALJ adequately took into account the totality of the evidence relevant to Matejevich's

---

[2] Presumably because they acted on the basis of information provided by Matejevich, whom the ALJ did not find to be credible, the ALJ devotes almost no discussion to the findings of the claimant's treating psychiatrists with respect to headaches or to the conclusions of the specialists who treated her for headaches. He does mention a mental assessment conducted by Dr. Miller in October 2005. Dr. Miller, who had treated Matejevich over a three year period stated that the claimant did not have the energy or the stamina to sustain work activity because she has only fleeting periods of normal functioning. (T. 19). The ALJ gave "limited weight to this opinion" because "the claimant has had long periods of sustained good functioning." Id.

headaches when, in formulating her residual functional capacity, he wrote: "Her chronic headaches and depression limit her to performing no more than simple, routine, repetitive tasks." (T. 20). The ALJ does not explain why he reasoned that work-related limitations associated with chronic headaches could be addressed by limiting the claimant's work to simple routine tasks. If the only impact of the headaches involved difficulty concentrating, this might make sense. The record, however establishes that there were larger issues surrounding the impairment, such as photophobia, nausea, fatigue, and the need to be inactive during and after the headache. In light of the evidence, it is unlikely that the claimant could work at all - even on simple tasks - while in the throes of a migraine.

The ALJ's failure to discuss the significant portion of the record detailing the intensity, frequency, and recurring nature of Matejevich's migraine headaches, convinces the court that the ALJ's evaluation of this impairment was inadequate. In determining a claimant's residual functional capacity, the ALJ is obligated to weigh the credibility of the medical and non-medical evidence included in the record, and to explain his conclusion comprehensively and analytically. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981). Without this thorough explanation the "court cannot tell if significant probative evidence was not credited or simply ignored." Burnett, 220 F.3d at 121 (quoting Cotter, 642 F.2d at 705).

Given the questions unresolved by the ALJ's discussion, the court is constrained to conclude that his determination of Matejevich's residual functional capacity is not supported by substantial evidence. This means that the formulation of the questions posed to the vocational expert at Step Five may have been flawed as well.

This court is not authorized to substitute the Commissioner's analysis on appeal for a discussion of the evidence undertaken by the ALJ. Nor is the Court authorized to conduct a de novo review of the evidence. Evaluation and discussion of the record evidence are the province, in the first instance, of the ALJ. See Fargnoli, 247 F.3d at 42. Accordingly, remand for

reevaluation of Matejevich's headache complaints and their impact on her overall capacity for work is warranted. This will likely require a new hearing in order to determine whether, in fact, Matejevich continues to suffer from migraine headaches, and if so, how often. The answers to these questions may necessitate that revised questions be posed to a vocational expert.

### III. <u>CONCLUSION</u>

Because the Commissioner's residual functional capacity determination is not supported by substantial evidence, it is recommended that the pending Motions be remanded to the Commissioner in order to give the ALJ an opportunity expeditiously to reevaluate the migraine-related evidence bearing on the claimant's residual functional capacity, and, if necessary, to reformulate the questions to be posed to a vocational expert.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute a waiver of any appellate rights.

    Respectfully submitted,

    */s/ Amy Reynolds Hay*
    United States Magistrate Judge

Dated: 21 December, 2007

cc: Hon. Terrence F. McVerry
      United States District Judge

      All counsel of record by Notice of Electronic Filing